# Staunton

## WILLIAM TATE v. COMMONWEALTH.

September 18, 1930.

Absent, Holt and Epes, JJ.

1018

*A. B. Hunt,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

PRENTIS, C. J., delivered the opinion of the court.

The accused has been convicted of murder in the second degree and sentenced to seven years confinement in the penitentiary. He killed William Barnett, his wife's brother, shooting him with a shotgun while at close range—say, within twenty feet or less. These are the circumstances of the homicide, according to testimony of the accused and his witnesses:

The deceased charged the accused with cruelty to his wife, the sister of the deceased. He used violent, coarse and vulgar language, cursed the accused and threatened to attack him, "to put six balls into him," all while standing close by and with his right hand in his overcoat pocket. The replies of the accused were few and chiefly confined to denying the accusations of deceased. The accused was at the time working on his automobile, and apparently to avoid the threatened attack, left the place and went into his house near by. The deceased, Barnett, continued from the outside to abuse him, and thereafter the accused armed himself with his gun, went into a toilet, sat in there about fifteen minutes and then, after the lapse of about fifteen minutes more, the homicide occurred. The accused thus describes the shooting: "When Brower (his helper) came down by there calling me, but I didn't go out just then, I was arranging my clothes, and as I stepped out of the door and got about two feet from the toilet door, Barnett (the

deceased) came around the other corner of the house between the stucco house and that shed, and as he got there I got out of the door about three feet, and he looked at me and said, 'G—— d—— I am looking for you,' and when he said that I had the gun at my side like that (indicating), and when he said that I raised it up and fired before I got it up.

"Q. When he said 'G—— d——, I have been looking for you,' I want you to stand up and show exactly where his hand was, and if he turned, how he turned when he said that, supposing I am you now.

"A. He was going in this direction towards my house, and when he got in the clear there he saw me coming out of this door, he had a cigarette in his mouth and he threw that out and he said 'G—— d——, I have been looking for you,' and when I raised up my gun he did something like that (indicating).

"Q. Did you take any aim or anything?

"A. No, sir.

"Q. You just raised it up and shot?

"A. Yes, sir.

"Q. What made you shoot at him?

"A. He ran his hand in his pocket and said, 'G—— d——, you, I have been looking for you.'

"Q. What was it you thought he had?

"A. I thought he had a gun.

"Q. And you shot him for what purpose?

"A. To protect myself.

"Q. From what he said to you when he advanced there, taking all that he said, and your attitude towards him, would you have shot him if he had not done and said what he did?

"A. No, sir.

"Q. Of course, the gun did not shoot but once?

"A. No, sir.

"Q. When you shot him, could you tell that you hit him, or not?

"A. No, sir; I didn't look to see.

"Q. Which way did you go?

"A. I went through into the workshop there; I thought he was following me.

"Q. What did you do with the gun?

"A. After I went in the shed and did not hear anyone coming behind me, I went out and locked the door and went into my father's house and dropped the gun in the house, and kept on out to the front.

"Q. When you got to the front who was out there?

"A. I didn't see anyone out there.

"Q. What did you do?

"A. I got in my truck and drove off.

"Q. Where were you going?

"A. I had a ton of coke to be delivered on Chapman avenue.

"Q. Did you deliver that?

"A. Yes, sir."

He then went to the police station where he was arrested.

A witness for the prosecution testified that he, while on the upper porch of a house near by, had a full view of the occurrence; that the deceased was standing on the porch of the stucco house when the accused came in his (witness') sight with a gun, raised it and shot the deceased while he was still on the porch, and that he jumped or fell from the porch immediately. The doctor testified that the accused was shot in the left side of the neck; that in his opinion most of the load of shot struck him; that his death was immediate; and that he fell not more than three feet from the porch. Witnesses testified that the deceased had a rock in his hand in his overcoat pocket; and that the accused had a good reputation for truthfulness and as a peaceable man. There is other testimony but none which changes the significance of that which we have recited.

That the accused had great provocation and avoided a fight before he first retired from the scene and armed himself is clear, but the necessity for his subsequent return to the place and the shooting of Barnett, even upon his own testimony, is not clear, and the conceded facts presented a case for submission to a jury. That the evidence is sufficient to support the verdict is quite apparent.

The giving of instruction "B" is assigned as error. This reads:

"The court instructs the jury that when homicide is shown, the law presumes it was done with malice or forethought; when the proof shows an unlawful homicide, and thereby no other evidence as to how and why the crime was committed, the law implies it was done with malice or forethought. If the proof shows the killing itself discloses that it was done without malice, the presumption of malice is overcome, but if the proof of the killing itself does not show that it was done without malice, then the burden is upon the defendant to show that it was done without malice."

It is contended that this invaded the province of the jury and in substance told them that the homicide was unlawful, that being the fact in issue which depended upon the conclusion of the jury upon conflicting testimony. We do not so construe it. While objectionable because such general statements are rarely helpful to juries, nevertheless, in view of the six instructions given on motion of the accused, which are based upon the concrete facts of this case, there is no reason to doubt that the jury fully understood the only issue of fact which they had to determine, i. e., whether the accused shot in self-defense.

It is also contended that instruction "D" was erroneous because it referred to "an altercation or quarrel" between the accused and the deceased previous to the homicide. The claim is that the accused was so quiet, and

restrained himself so completely, that the insulting language and threats made by the deceased on the first occasion should not have been described as an "altercation," because it takes two to make a quarrel. This is specious but unsound. If there are any more appropriate words to describe the wordy controversy occurring on the first occasion, they should doubtless have been used, but we know of none and the instruction correctly directed the jury to the inferences which they might draw from the facts shown.

The accused claimed that he shot in self-defense, and the six instructions given on his motion were full and clear. Had the jury believed from the evidence that he shot the deceased in self-defense and because he honestly believed that he was in any danger of death or of serious bodily harm, they would have acquitted him. The instructions fully safe-guarded every legal right of the accused.

■ ■ There are assignments of error based upon two occurrences during the examination of the witness, Brower, introduced by the prosecutor. While this witness was being examined in chief, the prosecuting attorney said: "He has turned adverse." Thereupon the trial judge said immediately: "It is perfectly apparent to the court that the witness is adverse and the Commonwealth's attorney is permitted to ask him leading questions." The prosecutor had already asked his witness several leading questions, and elicited testimony damaging to the accused, specifically that he, Brower, was calling the accused when the shot was fired; that Barnett was standing against a telegraph post smoking a cigarette and mumbling something to himself; and that he, witness, told the accused "to stay in there and not to come out."

Again, while the same witness was later being cross-examined by the defendant's attorney, this occurred: Witness was asked: "Just stand up with your hand in your coat pocket and show the jury just what you have said."

At this the judge interrupted with: "Don't ask this witness any more leading questions." Thereupon the attorney for the defendant saved the point; and thereupon the judge said: "All right, but you must not ask him any more leading questions."

The court erred in both instances. The testimony of the witness was neither plainly nor altogether adverse to the prosecution, and the court should not, under the circumstances, have used words so positively reflecting upon the witness, nor should he have ruled that the prosecutor could cross-examine him merely upon the statement that the witness had "turned adverse."

The only statute to which our attention is directed as affecting the question raised is Code 1919, section 6215, which reads:

"*Witness proving adverse; contradiction; prior inconsistent statement.*—A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall in the opinion of the court prove adverse, by leave of the court, prove that he has made at other times a statement inconsistent with his present testimony, but before said last mentioned proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement. In every such case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements, except for the purpose of contradicting the witness."

■ This section has been construed to apply to criminal as well as civil cases. *McCue* v. *Commonwealth*, 103 Va. 870, 49 S. E. 623. There is a discussion of the decision in 10 Va. Law Reg. 899, 1 Va. Law Reg. (N. S.) 664.

■ It is held in *Green* v. *Commonwealth*, 122 Va. 862, 94 S. E. 940, that as a witness so introduced cannot be im-

peached by general evidence of his bad character, *a fortiori* he should not be discredited before the jury by opinions of the prosecuting attorney with respect to his character.

In *Gordon* v. *Funkhouser*, 100 Va. 675, 42 S. E. 677, it is held that a party may by other testimony contradict his own witness who appears to be adverse, provided foundation is laid for such contradictory evidence by first calling to the attention of the witness the circumstances of the supposed contradictory statement sufficiently to designate the particular occasion, which should usually embrace the time, place and the person to whom it is alleged the statement was made.

In this case there was no suggestion that the witness, Brower, had ever made any inconsistent statements, and no effort was made to prove that he had ever done so. Nor do we perceive upon the printed page any indication that he was adverse or had made inconsistent statements on former occasions. Some of his testimony supported the theory of the prosecution, and some of it the defense of the accused, specifically as to the very great provocation which preceded the homicide. We perceive no reason for the claim of the prosecution that he had proved adverse, and scant support for the abrupt statement of the court that he had proved clearly adverse.

These being the circumstances, we think the ruling of the court was erroneous. Inasmuch, however, as in any event the case was one for submission to a jury, we do not under the circumstances of this case hold the error sufficient to require a reversal. We perceive no reason to suppose that the jury were unduly affected thereby, or that the verdict would have been different had the ruling been correct.

It is equally clear to us that the attorney for the accused had the right to cross-examine the witness, Brower. He had been introduced by the prosecutor, and nothing had occurred to justify the denial of that right. Under the

facts shown, the attorney for the accused had the right to cross-examine this witness.

■ This expression from a recent case, *State* v. *Zolantakis* (Utah), 259 Pac. 1044, 1047, 54 A. L. R. 1468, states the rule and its limitations: "In a judicial investigation the right of cross-examination is an absolute right and not a mere privilege of the party against whom the witness is called. It is only after such right has been substantially and fairly exercised that the allowance of further cross-examination becomes discretionary. 5 Jones Com. Ev., section 821. The reason for the rule is doubtless the fact that the cross-examination of a witness may not only modify and explain, but it may destroy the evidence in chief. A court is unable in advance to determine what will be the result of cross-examination in a given case. Legal procedure requires that the court hear before it condemns, and in such hearing cross-examination is often as enlightening as is the examination in chief."

■ If the court in this case intended to say that the defendant's attorney had already exhausted his privilege, this should have been made plain. That the privilege is frequently abused is also plain.

■ ■ It is argued from these occurrences by the attorney for the accused that the judge showed bias against the defendant and excited the prejudice of the jury so that he has not had a fair trial. But for the conceded facts, the testimony of the accused and his own account of the homicide, this contention would require serious consideration. Certain it is that the trial judge is the servant of the Commonwealth—one of its ministers of justice. He should always seek to avoid in manner and in his expressions everything that savors of impatience or brusqueness. His patience is sometimes sorely tried by inconsiderate attorneys, but in the measure that he fails to maintain the approved judicial traditions of patience, calmness, polite-

ness and consideration for the litigants, attorneys and witnesses, he subjects the administration of the law to distrust and criticism; and this failure, if and when it occurs, is an injury to the body politic, the Commonwealth.

The trial court overruled a motion of the accused to set aside the verdict upon the ground of after-discovered evidence.

The rules as to this have been so frequently stated that it is unnecessary to repeat them, and only necessary in this case to say that due diligence to secure it at the trial was not shown, and that had the testimony been then produced it is not probable that there would have been a different result. The trial court committed no error in overruling this motion.

We find no reversible error.

*Affirmed.*